# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

**SEALED FILED**

NOV 1 4 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of )
)
)
1565 ELM ST, CHICO, CA )
)
)

Case No.

2:19 - SW 1 0 2 0    KJN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing firearms without a license |
| 18 U.S.C. § 922(g) | Felon in possession of a firearm |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Richelle Caballero Nelson, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Nov. 13, 2019

_____
*Judge's signature*

City and state: Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

McGREGOR W. SCOTT
United States Attorney
MICHAEL W. REDDING
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of: | CASE NO. |
| 1565 ELM ST, APT 1, CHICO, CA | AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE |

1.     I, Richelle Caballero Nelson, being first duly sworn, hereby depose and state as follows:

## I.     REQUEST FOR AUTHORITY TO SEARCH APARTMENT 1 AT THE SUBJECT PREMISES

2.     I previously obtained a search warrant from this Court on November 11, 2019 for a residence located at 1565 ELM ST, CHICO, CA.  Attached hereto as Exhibit 1, and incorporated herein by reference, is a copy of the referenced warrant.  After obtaining the aforementioned warrant, I learned additional information that relates to residence at 1565 ELM ST, CHICO CALIFORIA, namely that the residence consists of a duplex.  Through this Affidavit, I am requesting issuance of a new search warrant to search 1565 ELM ST, APT. 1, CHICO CALIFORNIA hereinafter the "**SUBJECT PREMISES**"[1]

---

[1] As described in Attachment A, ATF Special Agent Niccolo Coia believes that 1565 Elm Street is a Duplex consisting of two apartments. SA Coia believes that one apartment is accessible through a door on the Southeastern side of the residence (this is the **SUBJECT PREMISES**). SA Coia believes that another, separate apartment, is accessible via a door on the Eastern side of the residence (this is **not** the **SUBJECT PREMISES** and this affidavit and warrant are not directed at that location). SA Coia is not aware whether there are any numbers on the doors of the two apartments. However, given the proximity of a mailbox with the number "1" to the Southeastern door and the proximity of a gate with the number "2" to the Eastern door, SA Coia believes that the **SUBJECT PREMISES** are accurately described as Apartment 1 and the other, non-**SUBJECT PREMISES** are accurately described as

1  which is further described in Attachment A, for the things described in Attachment B.  **Law**

2  **enforcement will not execute the previously obtained search warrant included in Exhibit 1 and,**

3  **instead, seek permission for narrower authority to search only Apartment 1 at the listed address**.

4  Below are additional facts related to the identification of Apartment 1 in particular.  The facts and

5  probable cause related to the address of 1565 ELM ST, APT. 1, CHICO, CALIFORNIA as detailed in

6  the attached Exhibit is incorporated herein by reference and will not be restated herein.

7  

**II.    PROBABLE CAUSE**

8  **A.    April 24, 2019 Controlled Purchase of Ten Firearms from CARLOS and TORRES**

9      3.    On April 24, 2019, CARLOS text messaged ATF CI #27753[2] his address, "1565 Elm,"

10  from 650-679-5190.

11      4.    On this date, ATF Agents, ATF CI #27753[3] ("CI#1"), conducted a controlled firearm

12  purchase from Mario CARLOS at the **SUBJECT PREMISES**.

13      5.    CI#1 traveled to 1565 Elm Street in Chico, CA, parked in the driveway on the South Side

14  of the residence, and met CARLOS in the driveway.  CARLOS walked CI#1 through the gate on the

15  south east side of the residence, and then entered the residence through a white metal door immediately

16  to the left the fence, where ten firearms were laid out on the floor in the family room.  Because CI#1

17  only had $10,000.00 in funds, CARLOS and Julio TORRES, who was also present inside the residence

18

19

20  Apartment 2.  Accordingly, they will be referred to as such throughout this affidavit.  However, the
   **SUBJECT PREMISES** is most accurately described as and only consists of the apartment accessible by

21  way of the Southeastern door.

22      [2] According to ATF CI #27753's handler, he/she has been cooperating with ATF since
   December of 2018.  ATF CI #27753 is currently working for judicial consideration, monetary

23  compensation, and potential immigration benefits, including deferred action on removal.  ATF CI
   #27753's only criminal conviction occurred in 2019 when he/she pleaded guilty to 18 U.S.C. §

24  922(g)(5) (alien in possession of a firearm).  ATF CI #27753 has proven to be a reliable source of
   information in this and in other investigations, and his/her information has not been found to be false or

25  misleading

26      [3] According to ATF CI #27753's handler, he/she has been cooperating with ATF since
   December of 2018.  ATF CI #27753 is currently working for judicial consideration, monetary

27  compensation, and potential immigration benefits, including deferred action on removal.  ATF CI
   #27753's only criminal conviction occurred in 2019 when he/she pleaded guilty to 18 U.S.C. §

28  922(g)(5) (alien in possession of a firearm).  ATF CI #27753 has proven to be a reliable source of
   information in this and in other investigations, and his/her information has not been found to be false or
   misleading

1    **SUBJECT PREMISES**, agreed to "front" CI#1 the firearms to be paid at a later date.[4] CARLOS and

2    TORRES indicated to CI#1 that the total price would be $21,100.00. Also present in **SUBJECT**

3    **PREMISES** were two suspects later identified as Salvador ZAPIEN and Irving MEDINA during the

4    purchase, who helped count money during the purchase. CI#1 provided CARLOS with the $10,000.00

5    in government funds at that time, and departed.

6         6.    Below is a snapshot of the body worn camera that CI#1 wore during the purchase. The

7    pictures shows "1565" along with at least one mailbox in the picture, with another item to the left of it.



20   **B.**      **INTERVIEW OF JOSEPH BROWNING AFTER ARREST**

21        7.    On September 16, 2019, Agents conducted an interview of Joseph BROWNING, the

22   individual who was arrested during the wall stop of CARLOS on September 12, 2019.

23        8.    During the interview, BROWNING waived his MIRANDA Rights, and cooperated with

24   Agents. In summary, BROWNING stated that he moved from Georgia to California to work at a

25   marijuana grow. Once in California, he met Salvador Zapien, and moved into Zapien's residence at 1565

---

27       [4] "Fronting" is a practice employed by illegal firearms and drug traffickers.  It refers to a source
of supply providing a buyer with contraband on credit and agreeing to accept payment later, typically
28   after the buyer has resold the firearm or narcotics thereby obtaining the funds to pay back the source of
supply.

Elm Street in Chico, CA. BROWNING also stated that Mario CARLOS lived at 1565 Elm Street with his girlfriend. BROWNING stated that Irving Medina resides in the camper parked in the driveway.

### C.    SUBJECT PREMISES APPEARS TO BE A DUPLEX

9.    On November 12, 2019, ATF SA Coia contacted Sgt. Brian Miller from the Chico Police Department. Sgt. Miller stated that per their records system, it appears that 1565 Elm Street is a duplex with Apartment 1 and Apartment 2. Sgt. Miller further stated that Officers made contact with Salvador ZAPIEN on June 18, 2019 at 1565 Elm Street. Sgt. Miller stated that he observed a mailbox bearing #1 on the South Side of **SUBJECT PREMISES** while reviewing body worn camera footage that also captured ZAPIEN exiting the Southeastern door, the same door where CI #1 had entered on April 24, 2019, and the door SA Coia believes access the **SUBJECT PREMISES**. Sgt. Miller also confirmed that on the North Side of 1565 Elm Street (on Boucher Street), there was a "Keep Out" sign and a #2 posted on the fence. Sgt. Miller stated he did not see any other numbers on the fence where #2 was posted. Below is a picture of the officer body worn camera that shows #1 at 1565 Elm Street, in Chico, CA.



10. On this same date, SA Coia queried "1565 Elm Street, Chico, CA" through a real estate database. The search revealed that on "Loopnet.com", 1565 Elm Street is listed as a duplex with a total size of 1,768 square feet.

11. On this same date, SA Coia searched a records database for 1565 Elm Street, and revealed that Joseph BROWNING, the individual that was arrested with CARLOS on September 12, 2019, has a listed address of **1565 Elm Street, Apartment 1**, from January 2019 to October 2019. SA Coia also found that Salvador ZAPIEN, the individual who was present at the April 24, 2019 firearm purchase, and the individual that Chico PD contacted in June, is listed as a resident at **1565 Elm Street, Apartment 1**, with a date of August 2016 to August 2019. A subsequent law enforcement database query showed that ZAPIEN has previous addresses in Redwood City, CA, where CARLOS is from.

12. Based upon the above information, review of the body worn camera footage from the undercover purchase in April, and all other intelligence related to 1565 Elm Street, Chico, CA, Agents believe that the residence is a duplex, with two units, #1 and #2. Unit #1 appears to be accessible from the Elm Street driveway, while #2 appears to have access on the Boucher Street side (Northern Side). Agents believe that CARLOS is residing inside of the Unit of 1565 Elm Street accessible through the Southeastern door, which Agents believe is numbered Apartment 1 (**SUBJECT PREMISES**). As detailed in Attachment A, the **SUBJECT PREMISES** specifically excludes Apartment 2.

### III.        CONCLUSION

13. As detailed above, I submit that there is probable cause to believe that the **SUBJECT PREMISES** is used by the targets listed in Exhibit 1 and contacts evidence of the crimes also detailed therein. I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT PREMISES** described in Attachment A and seize the items described in Attachment B.

### IV.        REQUEST FOR SEALING

14. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

1  investigation will be searched at this time.  Based upon my training and experience, I have learned that

2  online criminals actively search for criminal affidavits and search warrants via the Internet, and

3  disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

4  through the carding forums.  Premature disclosure of the contents of this affidavit and related documents

5  may have a significant and negative impact on the continuing investigation and may severely jeopardize

6  its effectiveness.

7                                                          Respectfully submitted,

8

9                                                          Richelle Caballero Nelson
                                                           Special Agent
10                                                         ATF

11

12  Subscribed and sworn to before me on:  _Nov. 13, 2019_

13

14  The Honorable Kendall J. Newman
15  UNITED STATES MAGISTRATE JUDGE

16

17

18   /s/ Michael W. Redding
19  Approved as to form by AUSA MICHAEL W. REDDING

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

The property to be search is 1565 Elm Street, Apartment #1, (the "**SUBJECT PREMISES**") further described as the Apartment accessible by the Southeastern door of a single story, light colored multi-family (duplex) residence located in Chico, California. (See photograph, below.) There is a wooden gate and metal fence in front of the residence (on the Southern Side) and a front door with a white metal security door on the Eastern side of the residence, immediately after the gate. There is at least one mailbox with #1 on the South Side of **SUBJECT PREMISES**. There is also camper in front of the residence, and a driveway that is shared with another residence on the east side. On the North Side of **SUBJECT PREMISES**, there appears to be a wooden gate with a "2" affixed to it.

**The areas to be searched shall include** all attached rooms, attics, basements, porches, locked containers and safes, and other parts within the **SUBJECT PREMISES**, as well as the surrounding grounds, driveway, garages, campers, carports, storage rooms, storage lockers, yards, trash containers, and outbuildings that are associated with or assigned to the **SUBJECT PREMISES**. The **SUBJECT PREMISES** does **not** include, however, Apartment 2, which is also located at 1565 Elm Street, Chico, California

The search shall also include vehicles and campers parked in parking spaces dedicated to **SUBJECT PREMISES**, vehicles whose keys are present in **SUBJECT PREMISES**, or vehicles for which there is indicia of ownership, registration, or use found at **SUBJECT PREMISES**.







## ATTACHMENT B

### Items to be seized

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A ("**SUBJECT PREMISES**"), including any digital devices, for evidence, fruits or instrumentalities of violations of 18 U.S.C. 922(g) and 18 U.S.C. 922(a)(1)(A). These records and materials are more specifically described below.

1. Records, documents, or materials that identify the persons who have possession, custody, or control over the property and vehicles searched, including but not limited to, personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs (developed or undeveloped), leases, mortgage bills, vehicle registration information or ownership warranties, receipts for vehicle parts and repairs and telephone answering machine instructions;

2. Any documents, receipts, or records pertaining to the purchase, sale, or transfer of any firearms. These documents, receipts, and records include, but are not limited to photographs of firearms, catalogs, ledgers, customer lists, supplier lists, correspondence, notations, logs, receipts, invoices, ATF Form 4473s, California Dealer Record of Sale (DROS) Forms, and any other documents showing the acquisition, disposition, and dominion and control over any firearms and ammunition. Also, any telephone and address books, letters, telephone bills, personal notes, and other items reflecting names, addresses and telephone numbers of individuals who requested or obtained firearms or ammunition from or provided to CARLOS;

3. Any firearms, ammunition, and firearms parts or accessories, including but not limited to shell casings, magazine clips, silencers, scopes ammunition boxes, gun cases, holsters,

spare parts for firearms, firearms cleaning equipment, photographs of firearms or persons in possession of firearms, and receipts for the purchase and/or repair of these items;

4. Money ledgers, distribution or customer lists, price lists, supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devices noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

5. The following additional evidence, fruits, and instrumentalities of the above-listed violations of federal law:

   a. Names and contact information of individuals who may be engaged in the illegal possession of firearms;

   b. Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from a mobile telephone;

   c. Text messages relating to or referencing firearms;

   d. Incoming and outgoing voice mail messages relating to or referencing firearms;

   e. Browser messages and/or internet communications (e.g., e mail; text messages) relating to or referencing firearms;

   f. Documents in electronic format relating to or referencing firearms;

   g. Photographs and videos reflecting firearms possession.

6. Devices or media that store data electronically, including personal computers, desktop computers, laptop computers, tablet computers, PDAs; iPads; mobile telephones or smartphones, pagers and answering machines (collectively, "Electronic Devices") that

could contain evidence of firearms trafficking and/or firearms possession, including the items and materials listed in the paragraphs above.

7. The terms "records," "documents," and "materials" include all of the items described above in whatever form and by whatever means they may have been created and/or stored. This includes any photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices, as more fully described below;

8. Computers or storage media used as a means to commit the violations described above, including violations of 18 U.S.C. § 922(g) and 18 U.S.C. § 922(a)(1)A):

9. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the  COMPUTER or to conduct a forensic examination of the COMPUTER; records of or information about Internet Protocol addresses used by the COMPUTER;

k.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

l.  contextual information necessary to understand the evidence described in this attachment;

m. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

1  McGREGOR W. SCOTT
   United States Attorney
2  JAMES R. CONOLLY
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile:  (916) 554-2900
5
6  Attorneys for Plaintiff
   United States of America
7

8                IN THE UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the Search of:          CASE NO.

12  1565 ELM STREET, CHICO, CALIFORNIA       AFFIDAVIT IN SUPPORT OF AN APPLICATION
                                             UNDER RULE 41 FOR A WARRANT TO
13                                           SEARCH AND SEIZE

14  _____

15      1.      I, Richelle Caballero Nelson, being first duly sworn, hereby depose and state as follows:

16              **I.      INTRODUCTION AND AGENT BACKGROUND**

17      2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of

18  Criminal Procedure for a warrant to search the premises known as 1565 Elm Street, Chico, California,

19  hereinafter the "**SUBJECT PREMISES**," further described in Attachment A, for the things described in

20  Attachment B.

21      3.      Based on the facts stated herein, coupled with my training and experience, I believe there

22  is probable cause to believe that Mario CARLOS has committed, is committing, and will continue to

23  commit violations of 18 U.S.C. § 922(g), being a felon in possession of a firearm, and 18 U.S.C.

24  § 922(a)(1)(A), dealing firearms without a license.  There is also probable cause to search the

25  **SUBJECT PREMISES** for the evidence, instrumentalities, contraband, and/or fruits of these crimes

26  further described in Attachment B.

27      4.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives

28

AFFIDAVIT                                    1

1 (ATF), and have been since January 2015.  I am presently assigned to the ATF San Francisco Field

2 Division, Sacramento Field Office, in Sacramento, California.  I am a law enforcement officer of the

3 United States within the meaning of Title 18, United States Code, Section 2510(7).

4      5.     I have attended and completed the Criminal Investigation Training Program (CITP) at the

5 Federal Law Enforcement Training Center (FLETC) located in Glynco, Georgia and the Bureau of

6 Alcohol, Tobacco, Firearms, and Explosives Special Agent Basic Training (SABT) also conducted at

7 FLETC; training specifically on firearms, explosives, and laws pertaining to the possession, trafficking,

8 use, and criminal activity of both firearms and explosives.  I received my Bachelor's degree in English

9 from the University of California, Riverside and a Master's degree in Homeland Security and

10 Emergency Management from the School of Justice and Safety from Eastern Kentucky University.

11      6.     As an ATF Special Agent, I have conducted and participated in both state and federal

12 investigations involving the trafficking of firearms and distribution of controlled substances. I have

13 investigated and assisted in the prosecution of criminal street gangs engaged in illegal narcotics and

14 firearms trafficking.  During these investigations, I have participated in and/or served as the primary

15 case agent in cases involving various types of investigative techniques, including the use of electronic

16 surveillance, assistance from undercover agents and informants, and the controlled purchases of firearms

17 and narcotics from suspects.  I also have participated in physical surveillance operations, the execution

18 of state and federal arrest warrants, and in the serving of state and federal search warrants, resulting in

19 state and federal prosecution of defendants.  In addition to utilizing the aforementioned investigative

20 techniques, I have been required during these investigations to analyze information resulting from

21 traditional record searches, pen registers and trap and trace devices, financial records, utility records,

22 telephone toll and subscriber records, as well as information gathered from social media.  My work with

23 informants and cooperators has involved, among other things, monitoring meetings and recorded

24 conversations, and generally evaluating the reliability and truthfulness of an informant/cooperator.

25      7.     As a result of my training and experience, I have become familiar with the manner in

26 which illegal firearm and drug traffickers smuggle, transport, store, conceal and distribute firearms and

27 drugs, as well as how they collect and launder proceeds related to such activities.  I am also familiar

28 with the manner in which these individuals use telephones, coded communications, false or fictitious

1   identities, social media, and other means to facilitate illegal activities and thwart law enforcement

2   investigations.  I have also consulted and discussed these investigations with other law enforcement

3   officers and agents who are experienced in these types of investigations.

4          8.      Through my training, education, experience, and my conversations with other agents and

5   officers who conduct firearms trafficking investigations, I have become familiar with firearms

6   traffickers' use of mobile telephones, and their use of numerical codes and code words to conduct their

7   business.  In addition, I have become familiar with firearms traffickers' methods of operation, including,

8   but not limited to, the manufacturing, distribution, storage, and transportation of narcotics/firearms, and

9   the methods used by drug traffickers to collect, transport, and safeguard firearms.

10         9.      The facts in this affidavit come from my training and experience, observations by ATF

11   Special Agents and Task Force Officers, and information obtained from other agents and witnesses.  This

12   affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and

13   does not set forth all of my knowledge about this matter.

14         10.     This affidavit is intended to show only that there is sufficient probable cause for the

15   requested warrant and does not set forth all of my knowledge about this matter.

16   ## II.     PROBABLE CAUSE

17   ### A.     CARLOS's criminal history and licensure

18         11.     CARLOS's criminal history and court records indicate that on July 17, 2017, CARLOS

19   signed a Declaration Concerning a Plea or Change of Plea to Guilty or Nolo Contendre; Finding and

20   Order (Felony), in which he admitted to Felony – Carry Loaded Firearm in Public Place; Not Registered,

21   in San Mateo County, and that the maximum penalty for this crime is three years imprisonment.  He has

22   therefore been convicted of a felony offense and if prohibited from possessing firearms.

23         12.     A query of ATF databases indicates that CAROLS does not have, and has never had, a

24   federal firearms license that would allow him to sell firearms.

25   ### B.     April 22 to April 23, 2019, firearm sales discussions with Mario CARLOS

26         13.     On April 22, 2019, at 8:28 PM, ATF CI #27753[1] ("CI#1") contacted Mario CARLOS via

27

28       [1] According to ATF CI #27753's handler, he/she has been cooperating with ATF since December of 2018.  ATF CI #27753 is currently working for judicial consideration, monetary compensation, and potential immigration benefits, including deferred action on removal.  ATF CI

cellular phone number 650-679-5190 in regards to purchasing firearms.  ATF was aware from earlier

investigations that CARLOS is known to sell illicit firearms.  CARLOS stated that the firearms were "3

bands each" (which CI#1 and agents understood to mean $3,000) and could get CI#1 "7 or 8 of 'em."

CI#1 asked which type the firearms were, and CARLOS stated "3 or 4 regular ones, and 3 big ones,"

which CI#1 and agents understood to mean three or four handguns and three rifles.  CARLOS and CI#1

agreed that the deal occur on Wednesday, April 24, 2019.

14.     On April 23, 2019, CARLOS sent the following pictures to CI#1's phone via text

messages from 650-679-5190:





#27753's only criminal conviction occurred in 2019 when he/she pleaded guilty to 18 U.S.C. § 922(g)(5) (alien in possession of a firearm).  ATF CI #27753 has proven to be a reliable source of information in this and in other investigations, and his/her information has not been found to be false or misleading

15. On this same date, immediately after sending the pictures, CARLOS sent CI#1 a text message:

> CARLOS:     I got 2 of the first pic
>
> CARLOS:     I'm waiting on my boy to drop off the rest

16. At 4:15 PM, CI#1 contacted CARLOS, and CARLOS advised CI#1 to come to his residence the following day (April 24, 2019) to conduct the firearm transaction. CARLOS stated "his boy" (later identified as Julio TORRES) would be there, and that CI#1 could talk to his boy about doing future "business."

**C.    April 24, 2019 Controlled Purchase of Ten Firearms from CARLOS and TORRES**

17. On April 24, 2019, CARLOS text messaged CI#1 his address, 1565 Elm Street, Chico, California (the "**SUBJECT PREMISES**") from 650-679-5190.

18. On this date, ATF Agents, utilizing CI#1, conducted a controlled firearm purchase from Mario CARLOS at the **SUBJECT PREMISES**. Before the purchase, ATF agents searched CI#1, to confirm he/she had no unexplained contraband. Agents then equipped CI#1 with video/audio recording equipment, and an audio transmitter, and provided CI#1 with $10,000 in law enforcement funds.

19. CI#1 traveled to the **SUBJECT PREMISES**, and CARLOS walked outside when CI#1 was there. CARLOS walked CI#1 into the residence on the **SUBJECT PREMISES**, where ten firearms were laid out on the floor in the family room. Because CI#1 only had $10,000.00 in funds, CARLOS and Julio TORRES, who was also present inside the residence **SUBJECT PREMISES**, agreed to "front" CI#1 the firearms to be paid at a later date.[2] CARLOS and TORRES indicated to CI#1 that the total price would be $21,100.00. CI#1 provided CARLOS with the $10,000.00 in government funds at that time, and departed.

20. Following the transaction, CI#1 met with ATF agents, who searched CI#1 for contraband again, finding none. ATF agents also retrieved from CI#1 the audio/video recording equipment, as well as the firearms acquired during the controlled by.

---

[2] "Fronting" is a practice employed by illegal firearms and drug traffickers. It refers to a source of supply providing a buyer with contraband on credit and agreeing to accept payment later, typically after the buyer has resold the firearm or narcotics thereby obtaining the funds to pay back the source of supply.

**D.**    **September 12, 2019 Arrest of Mario CARLOS**

21.    From September 5 to September 11, 2019, CI#1 continued to communicate with CARLOS via a new cellular phone number 530-624-7038. CI#1 agreed to purchase additional firearms from CARLOS, and the deal was ultimately set to occur on September 12, 2019.

22.    On September 12, 2019, law enforcement personnel met to be briefed in Chico, about conducting surveillance and ultimately a Wall stop on Mario CARLOS. At 5:30 AM, surveillance units set up in view of **SUBJECT PREMISES.**

23.    At approximately 8 a.m., CI#1 called CARLOS via cellular phone. During the recorded conversation, CARLOS stated that he was trying to get two to three more firearms to sell. Specifically, CARLOS stated he had a "XD-9" for sale, which law enforcement recognized as a Springfield XD-9 9mm Handgun. CARLOS also stated that he was trying to get his "boy" to deliver two or three more firearms. CARLOS stated that he was waiting on a ride to get to the agreed location in Sacramento, but his friend normally worked until 4:00 PM, but was trying to get out early. CARLOS also stated that he had brought some firearms over to his friend's house as well.

24.    In further recorded conversations throughout the morning, CARLOS stated he had a fully-automatic shotgun for sale for $2,500.00, and a rifle for $3,000.00; CARLOS stated that his "whiteboy" was at a warehouse taking pictures of firearms, and this friend was going to bring an additional three firearms. CARLOS indicated that he would have in total two handguns and three long guns for sale.

25.    In conversations that followed, CARLOS updated CI#1 on his whereabouts, indicating that his friend was coming down to pick him up from the warehouse. CARLOS stated that his friend was coming from Redding, and was 30 minutes away.

26.    Several minutes later, CARLOS called and asked CI to check his Instagram for the pictures he had sent to the CI, and said that if the CI liked the firearms, he would bring them. CARLOS stated that he wanted $2,500.00 for the fully automatic shotgun, $1,000.00 for a 10mm, and $1,300.00 for one that was already at his friend's house. CARLOS indicated he was waiting still on his ride.

27.    At approximately 11 a.m., surveillance units then observed a white Dodge truck bearing Georgia license plate # ETH465 enter the driveway of **SUBJECT PREMISES** and park. It should be

6

noted that vehicle records checks indicated that this is Julio TORRES' vehicle.  Surveillance units observed Julio TORRES exit the vehicle, and then observed a passenger exit the front passenger door, carrying a blue blanket which appeared to be concealing large items. CARLOS was outside the residence and greeted both individuals.

28.     A short time later, surveillance units saw a white Toyota Tacoma arrive and park in the driveway of **SUBJECT PREMISES**. The Toyota had a Georgia license plate # BQ9DQA. Surveillance agents saw an individual, later identified as Joseph BROWNING, exit the driver's seat of the vehicle, and meet with TORRES, CARLOS, and additional unidentified individuals that were outside the residence. Shortly thereafter, all present appeared to go inside the residence.

29.     A few minutes later, surveillance agents observed CARLOS and BROWNING leave the residence and enter BROWNING's vehicle, the white Toyota Tacoma, and drive off.

30.     As planned, California Highway Patrol Officer conducted a Wall stop on CARLOS and BROWNING.  CARLOS and BROWNING were arrested for possessing two firearms inside the vehicle.  CARLOS was also arrested on two outstanding warrants from San Mateo County.  The items recovered from inside the vehicle are as follows:

- Black 12 Gauge Shotgun, Molot-Oruzhiue VEPR-12 Serial Number: 14VAC8513;
- Galil ACC SAR 7.62 caliber rifle, serial number: G2000149;
- 7.62 caliber magazines;
- 12-gauge drum magazine;
- 12-gauge ammunition;
- A blue blanket.

31.     On September 18, 2019, after CARLOS was released from jail, he contacted CI#1 from his cellular phone, via text, stating:

*"We got pullee over by hyw and my boy got hit whit the toys it was just 2 tho they drop the charges on me cuz my took the hit but he out now on bail"*

32.     On September 19 to September 21, 2019, CARLOS contacted CI from his Instagram Account "eastsideredwood" and asked "u still goong to want that" (which CI#1 understood to be a reference to the firearms). CI#1 asked "which ones," and CARLOS stated "10mm and one ak", "2gs," which CI#1 and agents understood to mean a 10 mm handgun, an AK-47 rifle, with a price of $2,000. CI#1 indicated that CI#1 was still interested in the weapons.

1  **E.**    **October 30, 2019 purchase of four firearms from CARLOS and Dylan JOHNSON**

2      33.      Between October 24 and October 29, 2019, a separate confidential informant, ATF

3  CI #27468[3] ("CI#2"), communicated with CARLOS about the purchase of additional firearms.

4  CARLOS stated his firearms source had a Thompson Style Submachine Gun for sale for $3,500.00,

5  which he conveyed to CI#2 in an October 24 text message that read: "35 for the tommy and its full"

6      34.      On October 29, 2019, CARLOS sent another text to CI#2, indicating that he had "One ar

7  and one ak stock one 10mm 3600.. And 3 motors for 3200 eash", which CI#2 understood to mean he

8  had one AR-style rifle, an AK-47 rifle, a 10 mm pistol (for $3,600), and three machine guns ("motors"),

9  for $3,200 each. CARLOS and CI#2 agreed to meet the next day for CS#2 to buy the firearms.

10     35.      On October 30, 2019, law enforcement officers briefed at a pre-determined location for

11 the controlled firearm purchase from CARLOS.

12     36.      At approximately 4:30 p.m., HSI SA Degnim, who was conducting surveillance,

13 observed CARLOS walk down the driveway of **SUBJECT PREMISES**, onto Elm Street, and then onto

14 Laurel Street. CARLOS was observed walking towards a residence on Laurel Street, but SA Degnim

15 was unable to see the exact location.

16     37.      At approximately 5:02 p.m., CARLOS contacted CI#2 via text and advised that he was at

17 his "boys" house, and stated "the same as last time", meaning the same friend.  He sent CI#2 a text

18 message a short time later that read: "1799-1653 Laurel St, Chico, CA 95928."

19     38.      At approximately 5:37 p.m., CARLOS called CI#2 and indicated that he had to go get the

20 "Tech" style firearm and the "Tommy" gun, because they were not his and he was working with

21 numerous firearm sources.  CARLOS stated he had one firearm with him, but not all three. CARLOS

22 then stated that he was going to go to his friend's house, and asked CI#2 to meet him there. CARLOS

23

24      [3] According to ATF CI #27468's handler, he/she has been cooperating with ATF since
December of 2018.  ATF CI #27468 is currently working for judicial consideration, monetary
25 compensation, and potential immigration benefits, including deferred action on removal.  ATF CI
#27468's only criminal convictions occurred in 2019 when he/she pleaded guilty to 21 U.S.C. §§
26 841(a)(1) and (b)(1)(A)(viii) (distribution of 50 grams or more of actual methamphetamine) and other
drug-related offenses.  Agents are also aware that ATF CI #27468 has previously engaged in the illegal
27 sale of firearms.  ATF CI #27468 has proven to be a reliable source of information in this and in other
investigations, and his/her information has not been found to be false or misleading."

28

1  stated he was going to take the firearm he had with him to his friend's house, and there would be two
2  more at that house. A few minutes later, CARLOS sent CI#2 a text message that read, "1007 Meier
3  Drive."

4      39.    At approximately 6:00 p.m., surveillance units then set up around 1007 Meier Drive,
5  Chico. SA Coia, TFO Avilla and SA Buenaventura met with CI#1 and CI#2. Agents searched both CIs,
6  as well as CI#2's vehicle, finding no contraband. Both CIs were outfitted with an audio and video
7  recorder as well as a transmitter. CI#2 was provided $10,000 in government funds to purchase firearms.

8      40.    At approximately 6:24 p.m., CI#1 and CI#2 arrived at 1007 Meier Drive. Agents
9  maintained aerial surveillance on the CIs as they arrived. The CIs parked their vehicle in the driveway
10 and CI#2 called CARLOS to advise they were outside. CARLOS and an unidentified white male adult
11 ("WMA"), wearing a beanie type hat walked outside and escorted both CIs into the residence, into
12 Apartment #2. Aerial surveillance confirmed that CARLOS and the WMA escorted them to this unit
13 specifically.

14     41.    Both CIs entered the residence with CARLOS and WMA. Once they were inside, SA
15 Coia could hear CARLOS, along with two other male voices, via the audio transmitters. SA Coia heard
16 a person say "Brand new in the box" and "never been shot." SA Coia also heard the same individual
17 say, "I got the tommy, I got the AR shotgun, and he's got the AK, I want 3500 for this one and 2500 for
18 the other one." SA Coia also heard CARLOS stated "800 right now." The CIs agreed to the purchase
19 and handed over $10,000 to WMA. SA Coia later heard an individual ask, "you guys want to buy some
20 top quality edibles?" From his training and experience, SA Coia understood this to mean edible
21 marijuana/cannabis products.

22     42.    SA Coia then heard CARLOS talk about a CHP traffic stop that occurred on September
23 12, 2019. CARLOS stated that he was arrested because he had an arrest warrant out for him. He added
24 that he lied about his names, and when CHP found the firearms, his friend in the car with him took
25 responsibility for the weapons. CARLOS stated that friend had left for Georgia. SA Coia knew
26 CARLOS was talking about the Wall stop that had occurred on September 12, 2019, in which CARLOS
27 and Joseph BROWNING had both been arrested.

28     43.    Some minutes later, both CIs exited the residence, and departed the location. Both CIs

AFFIDAVIT           9

traveled to a predetermined location, where they met with SA Coia and other agents. SA Coia searched both CIs and their vehicle for any unexplained firearms and narcotics, and found none. TFO Avila took possession of the purchased firearms and other items, and entered them into ATF Custody as follows:

- Kahr Arms – Auto Ordinance 1927A1 .45 caliber; serial #KN6906;
- Rifle box for the Kahr Arms firearm, labeled "Thompson Chicago Typewriter";
- Century Arms International RAS47 7.62x39mm; serial #RAS47047738;
- RWC Group (Kalasnikov) KS-12 12-gauge; serial #KSG002297;
- Red rifle box containing the Kalashnikov
- Intra-Tec TEC9 9mm pistol, serial #133452;
- 18 Rounds of Winchester 9mm ammunition.

44.     During the debrief that followed the operation, the CIs indicated that they met CARLOS and WMA outside the residence at 1007 Meier Drive, and they all walked into Apartment #2. Once they were inside, they observed four dogs, along with another individual, later identified as Dylan JOHNSON. From the conversation and surroundings, the CIs understood 1007 Meier Drive, Apt. #2, to be JOHNSON's residence. JOHNSON greeted them and started to discuss the firearms with both CIs, CARLOS, and WMA. CI#2 observed the Tommy gun and AR-type shotgun on the couch, and CARLOS brought over an AK style rifle and a TEC-style firearm. JOHNSON stated he was selling the "Tommy" gun and "AR type shotgun," and wanted $3,500.00 for the Tommy gun, and $2,500.00 for the AR type shotgun. CARLOS stated the AK's price was $3,200.00 and the TEC would cost $800.00. CI#1 handed WMA $10,000.00 in cash and counted it with him. JOHNSON stated they could order more firearms, and would have more coming in in the upcoming weeks.

## III.     RELEVANT KNOWLEDGE REGARDING FIREARMS TRAFFICKING AND POSSESSION

45.     Based on my on my experience and training and through consultation with experienced Special Agents and police officers, I know the following with respect to convicted felons and armed narcotics traffickers:

46.     Firearms traffickers like CARLOS will commonly possess firearms and ammunition, including handguns, pistols, revolvers, rifles, shotguns, silencers, explosives, incendiary devices, and other weapons to protect their profits, supply, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. I have learned from past experiences in

1   conducting firearms investigations, that persons who possess and purchase firearms and ammunition do
2   so for their personal use and as such keep the firearms for an extended period of time. Such weapons are
3   typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles,
4   where they are concealed from law enforcement and readily available.

5   47.   Firearms traffickers like CARLOS and persons who possess firearms will commonly
6   possess items associated with firearms, including but not limited to gun cases, ammunition, ammunition
7   cases, holsters, spare parts for firearms, firearms cleaning equipment, photographs (developed or
8   undeveloped), instruction material, catalogues, tools, packaging material, of firearms or other firearms
9   accessories, and receipts for the purchase and/or repair of all these items.  Such items are typically
10   maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they
11   are concealed from law enforcement and readily available.

12   48.   Firearms traffickers will generally keep a supply of firearms on hand for immediate sale.
13   The firearms are commonly kept on their person and in locations associated with the traffickers,
14   including in the home or in the vehicles of, or used by, the traffickers.  Firearms traffickers will often
15   hide their supply of firearms in garages, outbuildings, storage areas, and/or sheds associated with or near
16   their residence, or in yard areas surrounding such premises, by burying the firearms or otherwise
17   attempting to conceal its presence.

18   49.   Firearms traffickers will often use vehicles to transport firearms, equipment, and supplies
19   for the distribution of firearms to and from the traffickers' residences, as CARLOS did here.  The
20   traffickers use their vehicles, as well as the vehicles of their friends and associates, for such
21   transportation.

22   50.   It is also common for firearms traffickers like CARLOS to maintain books, receipts,
23   purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their
24   firearms trafficking activities, in order to account for the transportation, ordering, purchase,
25   manufacturing and distribution of firearms and the remittance of firearms proceeds. These ledgers are
26   more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces
27   of paper or may be recorded more formally in notebooks or even computer spreadsheets.  Such records,
28   which are frequently encoded in order to protect those involved in the distribution activities, will often

be maintained by traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so that they are close at hand and readily available for the purposes of ascertaining current balances. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

51. Firearms traffickers like CARLOS often maintain bank account records, wire transfer records, bank statements, money drafts, checks, letter of credit, credit card bills, safety deposit keys and records, money wrappers, money containers, income tax returns, records of financial transfers which reflect the money generated from the sale of narcotics.

52. Firearms traffickers like CARLOS often maintain items showing unexplained wealth or evidencing the proceeds derived from illicit trafficking, including records concerning currency, precious metals, and/or jewelry valued in excess of $1,000, documentation relating to the purchase of real estate or motor vehicles; records evidencing the establishment of shell corporations and/or business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders, travelers checks, bonds, stock certificates, passbooks, bank checks, bank deposit tickets, certificates of deposits, income tax returns, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money, money counting machines, and bags.

53. Firearms traffickers like CARLOS often maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses and email addresses, for the purpose of contacting their suppliers, customers, transporters and others involved in their illicit distribution activities, and these records are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their trafficking business. Moreover, such records are often stored electronically within the memory of computers and computer-related storage devices.

54. Firearms traffickers like CARLOS often use devices to conduct counter surveillance against law enforcement, such as two-way radios, police scanners, video surveillance systems, anti-bugging devices, cameras, monitors and recording devices.

55.     Firearms traffickers like CARLOS that engage in the sort of illegal activities described above often arrange illicit transactions through the use of communication devices such as cell phones.  I know that people who negotiate the illegal sale of firearms in the manner described above will often use cell phones to contact their sources of supply to obtain additional quantities of firearms. Similarly, traffickers will use cell phones to contact their customers to facilitate firearms transactions, specifically to discuss quantity and price, and arrange meeting locations. Further, based on my training and experience, I know that people who negotiate the illegal sales of firearms in the manner described above often have their records of telephone calls, text messages, SMS messages, and voicemails stored within the device and with the electronic communications storage for the cellular telephone service provider.  I know that cellular telephones are often programmed for speed dialing, contain contact lists and call activity.

## IV.     COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

56.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

57.     *Probable cause.*  I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a)     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

1    space—that is, in space on the storage medium that is not currently being used by an active

2    file—for long periods of time before they are overwritten.  In addition, a computer's operating

3    system may also keep a record of deleted data in a "swap" or "recovery" file.

4    c)    Wholly apart from user-generated files, computer storage media—in particular,

5    computers' internal hard drives—contain electronic evidence of how a computer has been used,

6    what it has been used for, and who has used it.  To give a few examples, this forensic evidence

7    can take the form of operating system configurations, artifacts from operating system or

8    application operation, file system data structures, and virtual memory "swap" or paging files.

9    Computer users typically do not erase or delete this evidence, because special software is

10   typically required for that task.  However, it is technically possible to delete this information.

11   d)    Similarly, files that have been viewed via the Internet are sometimes automatically

12   downloaded into a temporary Internet directory or "cache."

13   58.   *Forensic evidence.*  As further described in Attachment B, this application seeks

14   permission to locate not only computer files that might serve as direct evidence of the crimes described

15   on the warrant, but also for forensic electronic evidence that establishes how computers were used, the

16   purpose of their use, who used them, and when. There is probable cause to believe that this forensic

17   electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

18   a)    Data on the storage medium can provide evidence of a file that was once on the storage

19   medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph

20   that has been deleted from a word processing file). Virtual memory paging systems can leave

21   traces of information on the storage medium that show what tasks and processes were recently

22   active.  Web browsers, e-mail programs, and chat programs store configuration information on

23   the storage medium that can reveal information such as online nicknames and passwords.

24   Operating systems can record additional information, such as the attachment of peripherals, the

25   attachment of USB flash storage devices or other external storage media, and the times the

26   computer was in use. Computer file systems can record information about the dates files were

27   created and the sequence in which they were created, although this information can later be

28   falsified.

AFFIDAVIT                                              14

b)      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the

computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c)      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d)      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

59.      *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a)      The time required for an examination. As noted above, not all evidence takes the form of

documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b)       Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c)       Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

60.       *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

61.       Because it is possible that CARLOS is not the only person who uses the **SUBJECT PREMISES** as a residence, it is possible that the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is

1 | nonetheless determined that that it is possible that the things described in this warrant could be found on
2 | any of those computers or storage media, the warrant applied for would permit the seizure and review of
3 | those items as well.

4 | ### V.    CONCLUSION

5 | 62.    I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT**
6 | **PREMISES** described in Attachment A and seize the items described in Attachment B.

7 | //
8 | //
9 | //
10 | //
11 | //
12 | //
13 | //
14 | //
15 | //
16 | //
17 | //
18 | //
19 | //
20 | //
21 | //
22 | //
23 | //
24 | //
25 | //
26 | //
27 | //
28 | //

AFFIDAVIT

18

1

## VI.   **REQUEST FOR SEALING**

2        63.     It is respectfully requested that this Court issue an order sealing, until further order of the

3    Court, all papers submitted in support of this application, including the application and search warrant.  I

4    believe that sealing this document is necessary because the items and information to be seized are

5    relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

6    investigation will be searched at this time.  Based upon my training and experience, I have learned that

7    online criminals actively search for criminal affidavits and search warrants via the Internet, and

8    disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

9    through the carding forums.  Premature disclosure of the contents of this affidavit and related documents

10   may have a significant and negative impact on the continuing investigation and may severely jeopardize

11   its effectiveness.

12                                                              Respectfully submitted,

13

14                                                              _____

15                                                              Richelle Caballero Nelson
                                                                 Special Agent
16                                                              ATF

17   Subscribed and sworn to before me on:  Nov. 12, 2019

18

19   _____
     The Honorable Kendall J. Newman
20   UNITED STATES MAGISTRATE JUDGE

21

22

23   /s/ JAMES R. CONOLLY
24   Approved as to form by AUSA JAMES R. CONOLLY

25

26

27

28

AFFIDAVIT                                            19

## ATTACHMENT A

The property to be searched is 1565 Elm Street, Chico, California (the "**SUBJECT PREMISES**") further described as a single story, light colored residence located in Chico, California. (See photograph, below.) There is a wooden gate in front of the residence, and a front door on the Eastern side of the residence, immediately after the gate. There is a camper in front of the residence, and a driveway that is shared with another residence on the east side.

**The areas to be searched shall include** all attached rooms, attics, basements, porches, locked containers and safes, and other parts within the **SUBJECT PREMISES**, as well as the surrounding grounds, driveway, garages, carports, storage rooms, storage lockers, yards, trash containers, and outbuildings that are associated with or assigned to the **SUBJECT PREMISES**.

The search shall also include vehicles parked in parking spaces dedicated to **SUBJECT PREMISES**, vehicles whose keys are present in **SUBJECT PREMISES**, or vehicles for which there is indicia of ownership, registration, or use found at **SUBJECT PREMISES**.



## **ATTACHMENT B**

### **Items to be seized**

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A ("**SUBJECT PREMISES**"), including any digital devices, for evidence, fruits or instrumentalities of violations of 18 U.S.C. 922(g) and 18 U.S.C. 922(a)(1)(A). These records and materials are more specifically described below.

1. Records, documents, or materials that identify the persons who have possession, custody, or control over the property and vehicles searched, including but not limited to, personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs (developed or undeveloped), leases, mortgage bills, vehicle registration information or ownership warranties, receipts for vehicle parts and repairs and telephone answering machine instructions;

2. Any documents, receipts, or records pertaining to the purchase, sale, or transfer of any firearms. These documents, receipts, and records include, but are not limited to photographs of firearms, catalogs, ledgers, customer lists, supplier lists, correspondence, notations, logs, receipts, invoices, ATF Form 4473s, California Dealer Record of Sale (DROS) Forms, and any other documents showing the acquisition, disposition, and dominion and control over any firearms and ammunition. Also, any telephone and address books, letters, telephone bills, personal notes, and other items reflecting names, addresses and telephone numbers of individuals who requested or obtained firearms or ammunition from or provided to CARLOS;

3. Any firearms, ammunition, and firearms parts or accessories, including but not limited to shell casings, magazine clips, silencers, scopes ammunition boxes, gun cases, holsters,

spare parts for firearms, firearms cleaning equipment, photographs of firearms or persons in possession of firearms, and receipts for the purchase and/or repair of these items;

4. Money ledgers, distribution or customer lists, price lists, supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devices noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

5. The following additional evidence, fruits, and instrumentalities of the above-listed violations of federal law:

   a. Names and contact information of individuals who may be engaged in the illegal possession of firearms;

   b. Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from a mobile telephone;

   c. Text messages relating to or referencing firearms;

   d. Incoming and outgoing voice mail messages relating to or referencing firearms;

   e. Browser messages and/or internet communications (e.g., e mail; text messages) relating to or referencing firearms;

   f. Documents in electronic format relating to or referencing firearms;

   g. Photographs and videos reflecting firearms possession.

6. Devices or media that store data electronically, including personal computers, desktop computers, laptop computers, tablet computers, PDAs; iPads; mobile telephones or smartphones, pagers and answering machines (collectively, "Electronic Devices") that

could contain evidence of firearms trafficking and/or firearms possession, including the items and materials listed in the paragraphs above.

7. The terms "records," "documents," and "materials" include all of the items described above in whatever form and by whatever means they may have been created and/or stored. This includes any photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices, as more fully described below;

8. Computers or storage media used as a means to commit the violations described above, including violations of 18 U.S.C. § 922(g) and 18 U.S.C. § 922(a)(1)A):

9. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the  COMPUTER or to conduct a forensic examination of the COMPUTER; records of or information about Internet Protocol addresses used by the COMPUTER;

k.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

l.  contextual information necessary to understand the evidence described in this attachment;

m.  Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | )      Case No. |
| 1565 ELM ST, CHICO, CA | ) |
| | ) |
| | )     2:19 - SW 1020 -    KJN |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     Eastern    District of     California
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

    **YOU ARE COMMANDED** to execute this warrant on or before     November 26, 2019    *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     *10:30 A.M.*
                   *Nov. 13, 2019* _____    _____
                                                      *Judge's signature*

City and state:    Sacramento, California           Kendall J. Newman, U.S. Magistrate Judge
                                                       *Printed name and title*

SEALED

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.


_____          _____
      Signature of Judge                              Date

## ATTACHMENT A

The property to be search is 1565 Elm Street, Apartment #1, (the "**SUBJECT PREMISES**") further described as the Apartment accessible by the Southeastern door of a single story, light colored multi-family (duplex) residence located in Chico, California. (See photograph, below.) There is a wooden gate and metal fence in front of the residence (on the Southern Side) and a front door with a white metal security door on the Eastern side of the residence, immediately after the gate. There is at least one mailbox with #1 on the South Side of **SUBJECT PREMISES**. There is also camper in front of the residence, and a driveway that is shared with another residence on the east side. On the North Side of **SUBJECT PREMISES**, there appears to be a wooden gate with a "2" affixed to it.

**The areas to be searched shall include** all attached rooms, attics, basements, porches, locked containers and safes, and other parts within the **SUBJECT PREMISES**, as well as the surrounding grounds, driveway, garages, campers, carports, storage rooms, storage lockers, yards, trash containers, and outbuildings that are associated with or assigned to the **SUBJECT PREMISES**.  The **SUBJECT PREMISES** does **not** include, however, Apartment 2, which is also located at 1565 Elm Street, Chico, California

The search shall also include vehicles and campers parked in parking spaces dedicated to **SUBJECT PREMISES**, vehicles whose keys are present in **SUBJECT PREMISES**, or vehicles for which there is indicia of ownership, registration, or use found at **SUBJECT PREMISES**.







## ATTACHMENT B

### Items to be seized

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A ("**SUBJECT PREMISES**"), including any digital devices, for evidence, fruits or instrumentalities of violations of 18 U.S.C. 922(g) and 18 U.S.C. 922(a)(1)(A). These records and materials are more specifically described below.

1. Records, documents, or materials that identify the persons who have possession, custody, or control over the property and vehicles searched, including but not limited to, personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs (developed or undeveloped), leases, mortgage bills, vehicle registration information or ownership warranties, receipts for vehicle parts and repairs and telephone answering machine instructions;

2. Any documents, receipts, or records pertaining to the purchase, sale, or transfer of any firearms. These documents, receipts, and records include, but are not limited to photographs of firearms, catalogs, ledgers, customer lists, supplier lists, correspondence, notations, logs, receipts, invoices, ATF Form 4473s, California Dealer Record of Sale (DROS) Forms, and any other documents showing the acquisition, disposition, and dominion and control over any firearms and ammunition. Also, any telephone and address books, letters, telephone bills, personal notes, and other items reflecting names, addresses and telephone numbers of individuals who requested or obtained firearms or ammunition from or provided to CARLOS;

3. Any firearms, ammunition, and firearms parts or accessories, including but not limited to shell casings, magazine clips, silencers, scopes ammunition boxes, gun cases, holsters,

spare parts for firearms, firearms cleaning equipment, photographs of firearms or persons in possession of firearms, and receipts for the purchase and/or repair of these items;

4.   Money ledgers, distribution or customer lists, price lists, supplier lists, maps and written directions to locations, correspondence, notation logs, receipts, journals, books, pay and owe sheets, telephone records, telephone bills, address books, bank statements, storage unit receipts, wire transfer receipts, and other documents or devices noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

5.   The following additional evidence, fruits, and instrumentalities of the above-listed violations of federal law:

   a.   Names and contact information of individuals who may be engaged in the illegal possession of firearms;

   b.   Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from a mobile telephone;

   c.   Text messages relating to or referencing firearms;

   d.   Incoming and outgoing voice mail messages relating to or referencing firearms;

   e.   Browser messages and/or internet communications (e.g., e mail; text messages) relating to or referencing firearms;

   f.   Documents in electronic format relating to or referencing firearms;

   g.   Photographs and videos reflecting firearms possession.

6.   Devices or media that store data electronically, including personal computers, desktop computers, laptop computers, tablet computers, PDAs; iPads; mobile telephones or smartphones, pagers and answering machines (collectively, "Electronic Devices") that

could contain evidence of firearms trafficking and/or firearms possession, including the items and materials listed in the paragraphs above.

7. The terms "records," "documents," and "materials" include all of the items described above in whatever form and by whatever means they may have been created and/or stored. This includes any photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices, as more fully described below;

8. Computers or storage media used as a means to commit the violations described above, including violations of 18 U.S.C. § 922(g) and 18 U.S.C. § 922(a)(1)A):

9. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; records of or information about Internet Protocol addresses used by the COMPUTER;

k. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

l. contextual information necessary to understand the evidence described in this attachment;

m. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.